# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**DENNETTE MIERA GOMEZ,**

      **Plaintiff,**

    **vs.**                                      **Civ. No. 17-155  KK**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 11) filed June 29, 2017, in support of Plaintiff Dennette Miera Gomez's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability insurance benefits and Title XVI supplemental security income benefits.  On September 8, 2017, Plaintiff filed her Motion to Reverse and Remand For A Rehearing With Supporting Memorandum ("Motion").  (Doc. 18.)  The Commissioner filed a Response in opposition on October 26, 2017 (Doc. 20), and Plaintiff filed a Reply on November 13, 2017.  (Doc. 22.)  Having been granted leave of the Court, the Commissioner filed a Surreply on November 28, 2017.  (Doc. 24.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Doc. 26.)

# I. Background and Procedural Record

Claimant Dennette Miera Gomez ("Ms. Gomez") alleges that she became disabled on July 1, 2011, at the age of thirty because of migraines, posttraumatic stress syndrome ("PTSD"), anxiety, and depression. (Tr. 208, 211.[2]) Ms. Gomez completed the twelfth grade in 1999, and has worked as a gas station cashier, home healthcare provider, and call center representative. (Tr. 212, 213, 226-30.) Ms. Gomez reported she stopped working on July 1, 2011, due to her medical conditions. (Tr. 212.)

On August 15, 2013, Ms. Gomez filed an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.* (Tr. 182-83.) She also filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 184-87.) Ms. Gomez's applications were initially denied on October 17, 2013. (Tr. 68-78, 79-89, 90, 91, 120-24.) They were denied again at reconsideration on January 16, 2014. (Tr. 92-103, 104-15, 116, 117, 128-32.) On February 18, 2014, Ms. Gomez requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 134-35.) The ALJ conducted a hearing on June 10, 2015. (Tr. 30-67.) Ms. Gomez appeared in person at the hearing with non-attorney representative John Bishop.[3] (*Id.*) The ALJ took testimony from Ms. Gomez (Tr. 36-60), and an impartial vocational expert ("VE"), Nicole King (Tr. 60-66). On July 15, 2015, ALJ Eric Weiss issued an unfavorable decision. (Tr. 12-25.) On November 30, 2016, the Appeals Council issued its decision denying Ms. Gomez's request for review and upholding the ALJ's final decision. (Tr. 1-3.) On

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 11) that was lodged with the Court on June 29, 2017.

[3] Ms. Gomez is represented in this proceeding by Attorney Michael Armstrong. (Tr. 9-10.)

February 2, 2017, Ms. Gomez timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (pertaining to disability insurance benefits); *see also* 42 U.S.C. § 1382a(3)(A) (pertaining to supplemental security income disability benefits for adult individuals). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*,

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a), 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b).

92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3), 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled.

(5)     If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

**B.**     <u>Standard of Review</u>

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004);

*Casias*, 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

### III. <u>Analysis</u>

The ALJ made his decision that Ms. Gomez was not disabled at step five of the sequential evaluation. (Tr. 23-25.) Specifically, the ALJ determined that Ms. Gomez met the insured status requirements of the Social Security Act through December 31, 2015, and that Ms. Gomez had not engaged in substantial gainful activity since July 1, 2011. (Tr. 17.) He found that Ms. Gomez had the following severe impairments: panic disorder without agoraphobia, depressive disorder not otherwise specified, psychotic disorder not otherwise specified, attention deficit hyperactivity disorder, borderline personality disorder, mood disorder, and posttraumatic stress disorder. (*Id.*) The ALJ, however, determined that Ms. Gomez's impairments did not meet or equal in severity one the listings described in Appendix 1 of the

regulations.  (Tr. 18-19.)  As a result, the ALJ proceeded to step four and found that Ms. Gomez

had the residual functional capacity to perform a full range of work at all exertional levels but

with the following nonexertional limitations:

> she can understand, remember and carry out simple instructions and make
> commensurate work related decisions, but not at a production rate pace.  The
> claimant can deal with routine changes in work setting; maintain concentration,
> persistence and pace for 2 hours at a time during an 8-hour workday, with normal
> breaks; and have occasional interaction with supervisors, co-workers and the
> public.

(Tr. 19.)  The ALJ then determined at step five that considering Ms. Gomez's age, education,

work experience, and RFC, there were jobs that existed in significant numbers in the national

economy that the claimant could perform.  (Tr. 24-25.)

In support of her Motion, Ms. Gomez argues that (1) the ALJ improperly rejected the

opinion of treating nurse practitioner Nicholas Farrey; and (2) the ALJ's decision does not

include a function-by-function assessment of Ms. Gomez's mental limitations.  In her Reply,

Ms. Gomez further argues that the ALJ's reference to a "production rate pace" is not a

recognized work-related mental limitation.[5]  Specifically, Ms. Gomez asserts that the ALJ failed

to analyze Nurse Farrey's opinion regarding her ability to appropriately respond to normal work

pressure and changes in a routine work setting.  (Doc. 18 at 10-12.)  She also asserts that the

ALJ's mental RFC only addressed the frequency of Ms. Gomez's ability to interact with co-

workers, supervisors and the public, *i.e.,* occasionally, but did not address the appropriateness or

quality of her interactions.  (*Id.* at 13-16.)

For the reasons discussed below, the Court finds that the ALJ's reasons for according

only some weight to NP Farrey's medical source statements are not supported by substantial

---

[5] On November 17, 2017, the Court granted the Commissioner leave to file a Surreply.  (Doc. 23.)  On
November 28, 2017, the Commissioner filed a Surreply.  (Doc. 24.)

evidence, and that the ALJ's mental RFC failed to properly account for Ms. Gomez's limitations in responding appropriately to supervisors, coworkers and the public.

### A.  Relevant Medical History

#### 1.  Presbyterian Medical Group

##### a.  John Guttmann, M.D.

On December 23, 2010, Ms. Gomez presented to John Guttmann, M.D., of Presbyterian Medical Group with complaints of sinusitis and anxiety. (Tr. 321-22.) Dr. Guttman prescribed medication for sinusitis and counseled Ms. Gomez regarding her anxiety. (Tr. 322.) Ms. Gomez returned on April 28, 2011, with complaints of migraines, allergies, anxiety, and depression. (Tr. 279-84.) Dr. Guttmann assessed, *inter alia*, panic attacks and prescribed Citalopram and Trazamine. (Tr. 283.) On May 19, 2011, Ms. Gomez saw Dr. Guttman again for ongoing anxiety, sinus problems, and migraines. (Tr. 285-90.) Dr. Guttman assessed panic attacks, counseled Ms. Gomez on her panic attacks and anxiety, and prescribed Trazadone to aid with her sleep. (Tr. 289.) Ms. Gomez returned to see Dr. Guttmann next on January 28, 2013, for, *inter alia*, anxiety. (Tr. 291-300.) Ms. Gomez reported that she was "irritable with road rage, impatient, yells a lot, [and] very frustrated with little things." She stated that she had problems controlling her anger, and was facing battery and other criminal charges that were serious. (Tr. 298.) Dr. Guttmann assessed depressive disorder and referred Ms. Gomez for mental health care. (Tr. 298-99.) Dr. Guttmann prescribed Paxil. (Tr. 299.)

##### b.  Francisco P. Sanchez, Ph.D.

On February 27, 2013, Ms. Gomez presented to Francisco P. Sanchez, Ph.D., also with Presbyterian Medical Group, on referral from Dr. Guttmann. (Tr. 301-07.) Ms. Gomez presented with complaints of depression. (Tr. 303.) Ms. Gomez reported a history of abuse and

neglect, auditory hallucinations, and ADHD. (Tr. 305.) Ms. Gomez stated she got in many fights while in school and was kicked out of ninth grade for fighting. (Tr. 304-05.) She stated she was treated for anger management at Desert Hills and Hogares, and was prescribed Ritalin and Wellbutrin. (Tr. 303, 305.) She stopped anger management counseling and taking those prescribed medications at age 14. (Tr. 303.) Ms. Gomez stated she has trouble getting along with people, does not have much patience, and that lately things were getting worse. (*Id.*) She reported being on Paxil for a month, but her anxiety was worse. (*Id.*) Finally, she told Dr. Sanchez that she was taking Trazadone for sleep, but that she had trouble falling asleep because her mind was racing. (*Id.*) Dr. Sanchez performed a mental status exam and indicated Axis I diagnoses of Depressive Disorder and R/O Bipolar Disorder, and assessed a GAF score of 62.[6] (Tr. 306.) Dr. Sanchez planned to engage in counseling to decrease depressive symptoms and increase mood stability, and to refer Ms. Gomez to a psychiatric provider to be evaluated for appropriate medications. (*Id.*)

Ms. Gomez next saw Dr. Sanchez on April 18, 2013. (Tr. 308-13.) She reported that she started a "Seeking Safety Group," and would be starting an anger management group, through Partners in Wellness. (Tr. 311.) She stated she stopped taking Paxil because it was making her anxiety worse and caused her heart to race. (*Id.*) She told Dr. Sanchez that someone had called CYFD on her, but that the investigation had gone well. (*Id.*) She also told him that her court date for pending battery charges was approaching, that her husband would soon be getting out of jail, and that her five year old son was taking Adderall for ADHD. (*Id.*) Dr. Sanchez indicated Axis I diagnoses of Depressive Disorder and R/O Bipolar Disorder, and assessed a GAF score of

---

[6] The GAF is a subjective determination based on a scale of 100 to 1 of "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32. A GAF score of 62 indicates some mild symptoms (*e.g.,* depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.,* occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* at 34.

63.[7]  (Tr. 312.)  Dr. Sanchez noted that Ms. Gomez was getting counseling and psychiatric help at Partners in Wellness, but that if she did not get a psychiatric appointment by her next appointment, he would refer her to Kaseman for evaluation of medications for possible bipolar disorder. (*Id.*)

Ms. Gomez last saw Dr. Sanchez on May 23, 2013.  (Tr. 314-18.)  Ms. Gomez reported that she remained anxious.  (Tr. 317.)  She told Dr. Sanchez that her court date resulted in two years of probation.  (*Id.*)  Dr. Sanchez facilitated an appointment for Ms. Gomez with a psychiatrist at NM Solutions, and provided her with handouts on anger management and negative cognitions.  (*Id.*)  Dr. Sanchez indicated an Axis I diagnosis of Anxiety Disorder and assessed a GAF score of 62.[8]  (*Id.*)

### 2.   Partners in Wellness

On April 4, 2013, Ms. Gomez presented to Partners in Wellness on a referral by Los Lunas Teambuilders and initially saw LISW Patricia Grana.  (Tr. 343-51.)  Ms. Gomez told LISW Grana that her five year old son was receiving services through Teambuilders and that the staff believed Ms. Gomez would benefit from mental health services as well.  (Tr. 343.)  LISW Grana conducted an initial clinical and psychosocial assessment during which Ms. Gomez reported, *inter alia*, a history of physical and sexual abuse, and that she was always getting into fights in school.  (*Id.*)  Ms. Gomez stated she experienced a lot of anxiety, anger, and depression, and that she had auditory hallucinations.  (*Id.*)  Ms. Gomez stated that she was very anxious most of the time, had little or no ability to control her thoughts, was easily angered, had sleep difficulties, had recently been experiencing road rage, and had pending felony charges related in part to an altercation she had with a 16 year old female she believed was bullying her daughter.

---

[7] *See* fn. 6, *supra*.

[8] *Id.*

(*Id.*, Tr. 348.) LISW Grana assessed that Ms. Gomez met the criteria for Generalized Anxiety, Psychotic Disorder NOS, ADHD, Alcohol Abuse, Borderline Personality Disorder, and possible PTSD. (Tr. 350, 352-53.) She assessed a GAF score of 47.[9] (*Id.*) LISW Grana recommended Ms. Gomez for psychiatric evaluation and participation in a "Seeking Safety" group to support her PTSD and substance use issues.[10] (Tr. 354.) LISW Grana also completed a Crisis Plan and indicated that Ms. Gomez would participate in an anger management class to learn techniques for coping with her anger and aggression issues.[11] (Tr. 355-56.)

On June 7, 2013, Ms. Gomez underwent a psychiatric evaluation with Tuvia Breuer, D.O. (Tr. 338-42.) Ms. Gomez reported that

> she gets easily angered – she has low frustration. Patient states that triggers include, kids leaving things around, people not knowing how to drive, "people looking at me the wrong way[.]" [W]hen [she is] upset she scream[s], shouts, hyperventilates, at times she would punch people [], in the past she [has] punched mirror/punches wall. [P]atient is currently on probation for incident two years ago – there was a girl – 17 years old – who bullied her daughter – she approached the girl and a fight ensued. Patient states that fighting is a "drug for her . . . it gets [her] anger out." Patient states that her low frustration tolerance started in elementary [school].

(Tr. 338.) Ms. Gomez also reported her various histories; *i.e.,* medical, behavior, substance abuse, legal, family, psychiatric, medication, social, education and employment. (Tr. 339-40.) Dr. Breuer conducted a review of systems and mental status exam. (Tr. 340-41.) Dr. Breuer indicated Axis I diagnoses of Mood Disorder due to General Medical Condition Stable,

---

[9] A GAF score of 41-50 indicates serious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

[10] On April 15, 2013, Ms. Gomez began attending a Seeking Safety group. (Tr. 371-72.) She attended twelve group sessions at Partners in Wellness from April 15, 2013, through August 5, 2013. (Tr. 317-72, 376-77, 379-80, 382-83, 385, 387, 392, 395, 396, 398, 400, 416.) Ms. Gomez attended five Seeking Safety group sessions at Agave Health, Inc., from October 21, 2013, through December 2, 2013. (Tr. 425, 426, 429, 430, 431.)

[11] On April 19, 2013, Ms. Gomez began attending an anger management group. (Tr. 382-84.) She attended twelve anger management group sessions at Partners in Wellness from April 19, 2013, through July 19, 2013. (Tr. 373-74, 378-79, 380-81, 384, 386, 388, 391, 393, 397, 402, 412, 413.) She received a Certificate of Completion in August 2013. (Tr. 335.)

Posttraumatic Stress Disorder Rule Out Stable, Cannabis Abuse Rule Out Stable, and assessed a GAF score of 49.[12] (Tr. 341.) Dr. Breuer recommended continued therapy and discussed the risks and benefits of and prescribed Abilify and Remeron. (Tr. 341-42.)

### 3.    Agave Health, Inc. f/k/a Partners in Wellness

#### a.    Dr. Breuer

On December 6, 2013, Dr. Breuer reassessed Ms. Gomez for mood and anxiety. (Tr. 421-23.) Ms. Gomez reported a difficult couple of months having separated from her husband, and that she was having panic attacks. (Tr. 421.) She reported feeling irritable and angry, and having a difficult time getting out of bed. (*Id.*) Dr. Breuer noted that Ms. Gomez was having an acute exacerbation of anxiety in the context of psychosocial stressors. (Tr. 422.) Dr. Breuer indicated Axis I diagnoses of Panic Disorder Without Agoraphobia, Depressive Disorder NOS, Psychotic Disorder NOS, ADHD, and Alcohol Abuse. (*Id.*) She assessed Ms. Gomez's global risk as moderate. (*Id.*)

On January 17, 2014, Dr. Breuer reassessed Mr. Gomez for mood and anxiety. (Tr. 468-69.) Ms. Gomez reported that she recently found out was pregnant, which induced a panic attack. (Tr. 468.) Dr. Breuer noted that Ms. Gomez had anxiety issues and that her mood was stable. (Tr. 469.) Dr. Breuer discussed medication modifications with Ms. Gomez in light of her pregnancy. (*Id.*) Dr. Breuer's Axis I diagnoses remained the same, and she assessed Ms. Gomez's global risk as moderate. (*Id.*)

#### b.    Nicholas Farrey, NP, BHP

On March 6, 2014, Ms. Gomez began treating with Nicholas Farrey, NP, BHP, of Agave Health, Inc., for anxiety. (Tr. 472-73.) NP Farrey discussed medication options in light of Ms. Gomez's pregnancy. (*Id.*) NP Farrey noted "high anxiety," and indicated Axis I diagnoses

---

[12] *See* fn. 9, *supra*.

that mirrored Dr. Breuer's December 6, 2013, and January 17, 2014, diagnoses. (Tr. 473.) NP Farrey assessed a GAF score of 58.[13] (Tr. 473.)

Ms. Gomez saw NP Farrey eight times from March 6, 2014, through March 20, 2015. (Tr. 472-73, 474-75, 476-77, 478-79, 480-82, 482-83, 484-86, 493-95.) NP Farrey consistently indicated an Axis I diagnosis of Generalized Anxiety Disorder, and assessed GAF scores of 58[14] and 50.[15] (Id.)

On June 4, 2015, NP Farrey completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental) on Ms. Gomez's behalf. (Tr. 498-99.) NP Farrey assessed that Ms. Gomez's ability to understand, remember, and carry out instructions were affected by her mental impairments. (Tr. 498.) He indicated that she was *moderately impaired* in her ability to carry out short, simple instructions. (Id.) He indicated she was *markedly impaired* in her ability to (1) understand and remember short, simple instructions; and (2) make judgments on simple work-related decisions. (Id.) Finally, he indicated she was *extremely impaired* in her ability to (1) understand and remember detailed instructions; and (2) carry out detailed instructions. (Id.) NP Farrey explained that Ms. Gomez "exhibits poor insight and ability to follow instructions based on mood disorder history and anxiety. Social interaction and affective dysregulation further impair her functional ability." (Id.) NP Farrey also assessed that Ms. Gomez's ability to respond appropriately to supervisors, co-workers, and work pressures in a work setting were affected by her mental impairments. (Tr. 499.) He indicated she was *markedly impaired* in her ability to (1) interact appropriately with the public; (2) interact

---

[13] A GAF score of 51-60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

[14] *See* fn. 13, *supra.*

[15] *See* fn. 9, *supra.*

12

appropriately with supervisor(s); and (3) interact appropriately with co-workers. (*Id.*) He also indicated she was *extremely impaired* in her ability to (1) respond appropriately to work pressures in a usual work setting; and (2) respond appropriately to changes in a routine work setting. (*Id.*) NP Farrey explained that Ms. Gomez "requires significant social and medication support to operate outside of her home. Small changes and pressures require constant time and medication changes." (*Id.*)

### c.     LPCC Debra Carter

On December 18, 2013, Debra Carter, MA, LPCC, BHP saw Ms. Gomez for an outpatient treatment. (Tr. 467.) Ms. Gomez reported that her anxiety was "off the roof" and easily triggered. (*Id.*) Ms. Gomez also reported that the Lorazepam was not working yet, although she had only been on the medication for a short time. (*Id.*) Ms. Gomez was scheduled to return the following week to work on triggers. (*Id.*)

On March 3, 2015, LPCC Carter conducted a diagnostic evaluation of Ms. Gomez for reassessment of services through Agave Health, Inc. (Tr. 487-92.) Based on the information she gathered at the engagement session, she diagnosed Ms. Gomez with Generalized Anxiety Disorder and assessed a GAF score of 48.[16] (Tr. 491.) She recommended that Ms. Gomez continue individual counseling for anxiety and to continue medication management. (*Id.*) LPCC Carter also recommended a Seeking Safety group and anger management, which Ms. Gomez declined. (*Id.*)

On September 21, 2015, LPCC Carter prepared a Medical Assessment of Ability To Do Work-Related Activities (Mental) on Ms. Gomez's behalf. (Tr. 503-04.) She assessed that Ms. Gomez was *moderately limited* in her ability to (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very

---

[16] *See* fn. 9, *supra*.

13

short and simple instructions; (4) maintain attention and concentration for extended periods of time; (5) make simple work-related decisions; (6) accept instructions and respond appropriately to criticism from supervisors; and (7) be aware of normal hazards and take adequate precautions. (*Id.*) She also assessed that Mr. Gomez was *markedly limited* in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; (4) sustain an ordinary routine without special supervision; (5) work in coordination with/or proximity to others without being distracted by them; (6) complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods; (7) interact appropriately with the general public; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (10) respond appropriately to changes in the work place; (11) travel in unfamiliar places or use public transportation; and (12) set realistic goals or make plans independently of others. (*Id.*)

LPCC Carter also assessed that Ms. Gomez met the criteria for Listing 12.04 – *Affective Disorder* and 12.08 – *Personality Disorder.* (Tr. 505-06.)

**B.** **The ALJ's Reasons for According Only Some Weight to NP Farrey's Assessment Are Not Supported by Substantial Evidence**

The ALJ accorded only some weight to NP Farrey's functional assessment of Ms. Gomez's ability to do work related mental activities. (Tr. 22.) In so doing, the ALJ explained that the "overall evidence, including Mr. Farrey's treatment notes previously discussed and the claimant's testimony do not support the marked or extreme limitations." (Tr. 22.) Ms. Gomez argues that the ALJ's opinion "seems to be a mere *pro forma*" because some of the limitations assessed by NP Farrey are in line with the ALJ's mental RFC, while others were

rejected without an explanation. (Doc. 18 at 11.) For example, Ms. Gomez explains that the ALJ accepted that Ms. Gomez had difficulty interacting with others and was limited to simple work, but failed to explain or address why he rejected NP Farrey's assessment that she was extremely limited in her ability to respond to normal work pressures and changes in a routine work setting. (*Id.* at 11-12.) The Commissioner contends that the ALJ properly referenced and discussed elsewhere in his determination that the medical evidence demonstrated only moderate psychological symptoms and relatively good functioning, and that Ms. Gomez engaged in a wide array of daily activities, including caring for two young children. (Doc. 20 at 10.) The Commissioner further contends that even though the ALJ did not discuss specific evidence in the paragraph in which he weighed NP Farrey's opinion, the ALJ's reasoning was nonetheless apparent in his determination. (*Id.*) Finally, the Commissioner contends that the ALJ properly relied on State agency nonexamining psychological consultant opinion evidence, giving their opinions great weight, wherein they assessed Ms. Gomez could perform simple work with limited interaction with others. (*Id.* at 11.)

The regulations contemplate the use of information from "other sources," both medical and non-medical, in making a determination about whether an individual is disabled. *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. §§ 404.1502, 404.1513(d), 416.902, 416.913(d)). Recognizing the growth of managed health care in recent years and the increasing use of medical sources who are not technically "acceptable medical sources," SSR 06-03p states that

> medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinion from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues

such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3. Thus, evidence from other medical sources[17] and non-medical sources[18] may be used "to show the severity of an individual's impairment(s) and how it affects the individual's ability to function." *Id.*; *see* SSR 06-03p, 2006 WL 2329939, at *2. "Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source'[19] for this purpose." SSR 06-03p, 2006 WL 2329939, at *2.

An ALJ is required to explain the weight given to opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6; *see also Keyes-Zachary v. Astrue,* 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). Although opinions from other medical sources and non-medical sources who have seen a claimant in their professional capacity cannot be given controlling weight, an adjudicator may determine that opinions from such sources are entitled to greater weight than a treating source medical opinion. SSR 06-03p, 2006 WL 2329939, at *6. The weight given to this evidence will

---

[17] Other medical sources are nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapist. SSR 06-03p, 2006 WL 2329939, at *2.

[18] Non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. SSR 06-03p, 2006 WL 2329939, at *2.

[19] "Acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1.

vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.,* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5.

The ALJ's explanations for according only some weight to NP Farrey's functional assessment are not supported by substantial evidence and amount to speculation. Here, in weighing NP Farrey's opinion pursuant to SSR 06-03, the ALJ noted NP Farrey's lengthy history of treating Ms. Gomez for her mental complaints, (Tr. 22), but then discounted NP Farrey's opinion by relying on inconsistencies in the "overall medical record" and Ms. Gomez's activities of daily living. The ALJ's reasons are inadequate because they are based on mischaracterizations of the evidence or incomplete accounts of the record. For example, the ALJ states that "claimant's anger management counselor revealed complaints of continued irritability, but her mood swings were linked to the fact that she was not taking her medications regularly." (Tr. 21.) This statement is not supported by the record. The Court's review of the medical record evidence demonstrates that Ms. Gomez was in an anger management group from April 19, 2013, through July 19, 2013. (Tr. 373-74, 378-79, 380-81, 384, 386, 388, 391, 393, 397, 402, 412, 413.) However, none of the anger management treatment notes prepared by Ms. Gomez's anger management counselor discuss Ms. Gomez's medication or whether she was medication compliant. (*Id.*) Further, just prior to starting her anger management group, Ms. Gomez reported to Dr. Sanchez on April 18, 2013, that she had discontinued taking Paxil

because it made her anxiety worse and it caused her heart to race.  (Tr. 311.)  Dr. Sanchez did not prescribe anything in Paxil's place.  (*Id.*)  On June 7, 2013, Ms. Gomez began taking Abilify and Remeron, as prescribed by Dr. Breuer after her psychiatric evaluation of Ms. Gomez.  (Tr. 341.)  On August 15, 2013, Ms. Gomez reported to the Administration that she was taking Abilify and Remeron as prescribed.  (Tr. 214.)  Thus, there is no evidence in the record to support the ALJ's statement that Ms. Gomez's anger management counselor attributed Ms. Gomez's continued irritability to medication noncompliance, nor is there evidence to support that Ms. Gomez was not compliant with her medication while in her anger management group.

Next, the ALJ states that medications had been relatively effective in controlling Ms. Gomez's symptoms, and that any increased symptoms were due to medication noncompliance or increased domestic struggles.  (Tr. 22.)  As an initial matter, it is mere speculation that any favorable response to medication rendered Ms. Gomez less restricted in her ability to do work related mental activities than NP Farrey assessed.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (noting that treatment notes indicating that a claimant was "stable" may have simply meant that claimant was not suicidal); *see also McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgment, speculation or lay opinion").  That aside, the medical records indicate that although Ms. Gomez had various domestic challenges,[20] her symptoms were

---

[20] On December 6, 2013, Ms. Gomez reported to Dr. Breuer that she and her husband were separated.  (Tr. 421.)  On December 18, 2013, Ms. Gomez reported to LPCC Debra Carter that she and her husband were divorcing.  (Tr. 467.)  On January 17, 2014, Ms. Gomez reported to Dr. Breuer that she recently learned she was pregnant.  (Tr. 468.)  On May 1, 2014, Ms. Gomez reported to NP Farrey that she learned her unborn child had a cleft palate.  (Tr. 476.)

either not stable or worsening in the face of medication compliance and ongoing individual therapy; *i.e.,* on March 6, 2014, NP Farrey noted that Ms. Gomez was medication compliant, but was experiencing high anxiety (Tr. 473); on May 1, 2014, NP Farrey noted that Ms. Gomez was medication compliant, but that her generalized anxiety disorder was worsening (Tr. 477); on June 12, 2014, NP Farrey noted that Ms. Gomez was medication compliant, but having a lot of mood swings and that her generalized anxiety disorder was worsening (Tr. 478-79); on October 3, 2014, NP Farrey noted that Ms. Gomez was medication compliant, but still having mood issues (Tr. 482-83); on March 30, 2015, NP Farrey noted that Ms. Gomez was medication compliant, but having increased symptoms (Tr. 493-94). The ALJ's explanation, therefore, is not supported by the record.

The ALJ also explained that the medical evidence demonstrated relatively good mental status exams and that the GAF scores generally indicated "mild" symptoms. (Tr. 22.) The records the ALJ cited in support,[21] however, although demonstrating fairly normal mental status exams, reflect GAF scores that indicated moderate and serious symptoms; *i.e.,* 58 and 50. (Tr. 473, 475, 477, 479, 481, 483.) This is significant because other Partners in Wellness/Agave providers also assigned GAF scores that indicated serious symptoms; *i.e.,* on April 11, 2013, LISW Grana assessed a GAF score of 47 (Tr. 351); on June 7, 2013, Dr. Breuer assessed GAF score of 49 (Tr. 341); on March 3, 2015, LPCC Carter assessed a GAF score of 48 (Tr. 492).[22]

---

[21] The ALJ cited Ex. 4F, pg. 101 (Client Services Note prepared by Michelle Adams of Agave Health, Inc. – there is no MSE or GAF score noted in this record) (Tr. 426)). (Tr. 22.) The ALJ also cited Ex. 8F, pgs. 6-25 (December 6, 2013, provider note by Dr. Breuer (Tr. 464-66); December 18, 2013, client services note by LPCC Debra Carter (Tr. 467); January 17, 2014, provider note by Dr. Breuer (Tr. 468-69, 470-71); March 6, 2014, provider note by NP Farrey (Tr. 472-73); April 3, 2014, provider note by NP Farrey (Tr. 474-75); May 1, 2014, provider note by NP Farrey (Tr. 476-77); June 12, 2014, provider note by NP Farrey (Tr. 478-79); September 5, 2014, provider note by NP Farrey (Tr. 480-81); and October 3, 2014, provider note by NP Farrey (Tr. 482-83)). (Tr. 22.)

[22] *See generally, Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (considering GAF scores and expressing "concern" with scores of 46 and 50); *Lee v. Barnhart*, 117 Fed.Apx. 674, 678 (10th Cir. 2004) (unpublished) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering

The ALJ also relied heavily on Ms. Gomez's daily activities to demonstrate inconsistencies between the record and NP Farrey's assessment, explaining that Ms. Gomez lives in an apartment; takes care of her two children alone, although occasionally with the help of her mother; and takes her children to doctor appointments, feeds them, clothes them, and takes them to programs and to school. (Tr. 22.) The specific facts behind these generalities, however, paint a very different picture. *See Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011) (finding that the specific facts of claimant's daily activities painted a very different picture than the generalities relied upon by the ALJ). The Court's review of the record demonstrates that Ms. Gomez has more than just occasional help from her mother. Ms. Gomez testified that her mother takes her seven year old son at least three times per week and most weekends because he makes her so angry that her "blood boils" and she needs a break.[23] (Tr. 59-60.) The record further demonstrates that Ms. Gomez testified that she usually gets help from a family friend to do her grocery shopping because she gets anxious and has panic attacks when she is around a lot of people. (Tr. 53, 59.) Ms. Gomez reported that her meal preparation consists of mostly frozen foods. (Tr. 220). Ms. Gomez also reported that although she has to go out to take her kids to school, she isolates herself and never goes out unless she has to. (Tr. 221, 239, 255, 359.) Thus, the ALJ failed to properly consider Ms. Gomez's activities of daily living in their full context. *See Thompson v. Sullivan*, 987 F.2d 1482, 1490 (10th Cir. 1993) (finding that sporadic performance of activities of daily living does not establish that a person is capable of engaging in substantial gainful activity); *see generally* 20 C.F.R. 404.1520a(c)(2) (explaining how the

---

with a claimant's ability to work . . ." but "[a] GAF score of fifty or less, . . . does suggest an inability to keep a job.").

[23] The record also demonstrates that Ms. Gomez has a fourteen year old daughter who lives full time with Ms. Gomez's mother. (Tr. 53, 347.)

administration rates the degree of functional limitation); POMS DI 22511.005.B[24] (describing assessment of functional areas within parameters of appropriateness, independence, sustainability, and quality and effectiveness). The ALJ erred in relying on an incomplete account of Ms. Gomez's testimony concerning her daily activities as a basis for discounting NP Farrey's opinion. *See Clifton*, 79 F.3d at 1009-10.

Finally, the ALJ accorded the State agency nonexamining psychological consultant assessments great weight and relied on them to demonstrate inconsistency between NP Farrey's functional assessment and the record as a whole. (Tr. 23.) However, in doing so, the ALJ failed to show that he considered the relative age of the State agency opinions in comparison to NP Farrey's assessment, or that the record evidence before the State agency consultants was limited. For instance, Dr. Mohney's assessment was rendered with the benefit of only the Presbyterian Medical Group records (Tr. 73-74, 84-85); while Dr. Johnson, at reconsideration, noted his review of the Presbyterian Medical Group records and only *two* records from Partners in Wellness/Agave; *i.e.,* Dr. Breuer's June 7, 2013, initial psychiatric evaluation of Ms. Gomez, and a September 13, 2013, progress note that demonstrated a neutral mood and affect (Tr. 97-98, 109-110). Additionally, Dr. Mohney rendered her assessment nineteen months *before* NP Farrey's assessment, and Dr. Johnson rendered his assessment fifteen months *before* NP Farrey's assessment. *See generally Jaramillo v. Colvin*, 576 F. App'x 870, 874 (10th Cir. 2014) (noting the significance of a recent physician's examination which found more limitations than an examination by another physician two years prior). Finally, the ALJ did not have the benefit of LPCC Carter's functional assessment of Ms. Gomez's ability to do work-related mental

---

[24] The POMS is "a set of policies issued by the Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999).

activities, which has been made part of the record and is now before the Court.[25]  Significantly, LPCC Carter's functional assessment is consistent with and supports NP Farrey's opinion that Ms. Gomez has greater functional limitations in her ability to do work related mental activities than those assessed by the State agency nonexamining psychological consultants.

For the foregoing reasons, the ALJ's explanations for discounting NP Farrey's functional assessment of Ms. Gomez's ability to do work related mental activities are not supported by substantial evidence.  *See Langley,* 373 F.3d at 1118 (a decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record.").

**C.      The ALJ Failed To Adequately Address Ms. Gomez's Ability to Respond Appropriately to Supervisors, Co-Workers and the Public**

When a mental impairment is alleged, the ALJ must assess the claimant's mental RFC. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). That is, the ALJ must assess the mental abilities of "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting." *Id.* §§ 404.1545(c), 416.945(c). The rulings specify that

> [i]n assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., *8 hours a day, for 5 days a week,* or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Soc. Sec. R 96–8p, 1996 WL 374184, at *7 (emphasis added) (footnote omitted).

Ms. Gomez argues that the ALJ failed to include a function-by-function assessment of her ability to do sustained work-related mental activities, specifically as it relates to her

---

[25] On September 25, 2015, Attorney Armstrong provided LPCC Carter's functional assessment to the Appeals Council.  (Tr. 502.)  On November 30, 2015, the Appeals Council received the additional evidence and made it a part of the record.  (Tr. 5.)

interaction with supervisors, co-workers and the public. (Doc. 18 at 13-15.) Ms. Gomez argues that limiting the frequency of her interaction with supervisors, co-workers and the public does not address her ability to respond appropriately to them. (Doc. 18 at 13-15.) The Commissioner contends that unskilled work requires no more than occasional interaction with supervisors, and that the ALJ gave a number of valid reasons, tied to the evidence, for discounting Ms. Gomez's complaints of disabling limitations in interacting with others. (Doc. 20 at 12-15.)

Here, Ms. Gomez reported to multiple providers her irritability, impatience, and inability to control her anger. On January 28, 2013, she told Dr. Guttman that she was irritable with road rage, impatient, yells a lot, and has problems controlling her anger. (Tr. 298.) On February 27, 2013, Ms. Gomez reported to Dr. Sanchez a history of anger management treatment, getting into many fights at school, and getting kicked out of ninth grade for fighting. (Tr. 304-05.) Ms. Gomez reported difficulty with getting along with people, having no patience, and that everything aggravates her. (Tr. 303.) She also reported that she currently had criminal charges pending that involved her getting into a fight with a teenage girl and being accused of ramming her ex-husband's car. (Tr. 304.) On April 11, 2013, Ms. Gomez reported the same history to LISW Patricia Grana at Partners in Wellness. (Tr. 343.) On psychosocial assessment that same date, CSW Janel Rector indicated that Ms. Gomez "acts out fairly often." (Tr. 360.) On June 7, 2013, Dr. Breuer noted that Ms. Gomez was easily angered and had low frustration. (Tr. 338.) Dr. Breuer cited Ms. Gomez's triggers as her kids leaving things around, people not knowing how to drive, and people looking at her the wrong way. (*Id.*) Dr. Breuer also noted that Ms. Gomez reacted by screaming, shouting, or hyperventilating, and at times would punch people or objects. (*Id.*) Ms. Gomez described to Dr. Breuer that fighting was a drug for her and got her anger out. (*Id.*) Dr. Breuer also noted that Ms. Gomez reported being in and out of jail

14 times for battery, assault, and DWI; that as a child she fought, was a truant, and shoplifted; and that CYFD was called about how she disciplined her children. (Tr. 339.) On September 23, 2013, Ms. Gomez reported that her anger and rage were preventing her from going out, that she was easily aggravated, and that she could not control her temper. (Tr. 222-23.) On November 8, 2013, Ms. Gomez reported that her anger was getting worse despite having gone through recent anger management counseling. (Tr. 235.) On June 10, 2015, Ms. Gomez testified that she was fired from her last job as a call center representative for being rude to customers and hanging up on them, and being rude to her supervisor. (Tr. 31-32.) She also testified to having "really bad road rage," and getting so angry with her seven year old son that her "blood boils." (Tr. 47, 59.)

All of the functional assessments in the record support that because of Ms. Gomez's recurrent anger problems, she has some degree of limitation in her ability to interact with supervisors, co-workers and the public. For instance, the State agency psychological consultants assessed Ms. Gomez with *moderate limitations* in her ability (1) to interact appropriately with the general public; (2) to accept instructions and respond appropriately to criticism from supervisors; and (3) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 76, 87, 101, 113.) They concluded that she could nonetheless adapt to work with *limited* interaction with others. (*Id.*) NP Farrey assessed that Ms. Gomez had *marked limitations* in her ability (1) to interact appropriately with the public; (2) to interact appropriately with supervisors; and (3) to interact appropriately with co-workers. (Tr. 499.) He explained that Ms. Gomez required significant social and medication support to operate outside of her home and that small changes and pressures required constant time and medication changes. (*Id.*) LPCC Carter assessed that Ms. Gomez had *moderate limitations* in her ability to accept instructions and respond appropriately to criticism from supervisors, and *marked limitations* in

her ability to (1) interact appropriately with the general public; and (2) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 504.) LPCC Carter explained that her assessments were based on her observations of Ms. Gomez at Agave Health sessions and from observing her in the lobby with others. (*Id.*)

Although the ALJ did not overlook Ms. Gomez's limitations related to her recurrent anger problems (Tr. 21),[26] the record evidence in this case demonstrates that, merely decreasing Ms. Gomez's contact with supervisors, co-workers and the public to occasional, which can be as much as up to one-third of an eight-hour work day,[27] fails to adequately address Ms. Gomez's limitations in her ability to respond appropriately. Less interaction does not necessarily make for appropriate interaction, and in light of the overwhelming evidence regarding Ms. Gomez's anger management problems and resulting behavioral extremes, the Court is not persuaded that the ALJ's mental RFC is supported by substantial evidence. *See generally* 20 C.F.R. 404.1545(c) (explaining that a limited ability in responding appropriately to supervision, co-workers, and work pressures in a work setting may reduce ability to do past work and other work); POMS DI 22511.005.B (describing assessment of functional areas within parameters of appropriateness, independence, sustainability, and quality and effectiveness); POMS DI 25025.010.B (providing example of a claimant who required excessive supervision, had poor work quality, and punched another employee who he perceived was making fun of him supported a finding of inability to respond appropriately to supervision, coworkers, and work situations). Additionally, NP Farrey assessed that Ms. Gomez had *marked limitations* in her ability to interact with supervisors, co-

---

[26] *See Hendron v. Colvin*, 767 F.3d 951, 956-57 (10th Cir. 2014) (holding ALJ's failure to perform explicit function-by-function analysis was not error where ALJ did not overlook limitations or restrictions pertinent to the work the claimant could do).

[27] *See generally* SSR 83-10, 1983 WL 31251 (defining "occasionally" as occurring from very little up to one-third of the time).

workers and the public. Although the ALJ discounted NP Farrey's assessment, the Court has concluded that the ALJ's explanations for doing so were not supported by substantial evidence. Finally, the VE testified that if Ms. Gomez were off-task 10 minutes every hour of the eight-hour workday, and absent from the workplace one day each month, due to mental impairments and conflict with others in the workplace, that she would not be able to perform other work. (Tr. 63.)

For the foregoing reasons, the Court concludes that the ALJ failed to adequately address Ms. Gomez's ability to respond appropriately to supervisors, co-workers and the public in determining Ms. Gomez's mental RFC, and that the mental RFC is not supported by substantial evidence.

### D.    Remaining Issues

The Court will not address Ms. Gomez's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### IV.  Conclusion

For the reasons stated above, Ms. Gomez's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 18) is **GRANTED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**